UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 2:22-cr-94-wks-2 |
| | ) | |
| FREDRICK CAMPBELL II | ) | |

**MOTION FOR SENTENCING RELIEF AND
SUPPORTING MEMORANDUM BY FREDRICK CAMPBELL II**

Fredrick Campbell II, through appointed counsel, respectfully submits this Motion for Sentencing Relief and Supporting Memorandum. He asks the Court to accept his Plea Agreement (**Doc. 122**) and, by way of downward departure and/or variance, accept and implement the government's recommendations to determine his base offense level under USSG § 2D1.1(c) by applying to the cocaine base at issue the guidelines converted-drug-weight-ratio applicable to powder cocaine (Plea Agreement ¶ 13(c)) and impose a four-year term of probation (*id.* ¶ 13 (d)) – unless the Court should determine that a lesser term is sufficient, but not greater than necessary, to achieve the statutory purposes of sentencing.

Should the Court decide instead to impose a term of imprisonment followed by a term of supervised release, Mr. Campbell objects to the special supervised release condition proposed in the PSR prohibiting all use of alcohol and requests that the Court prohibit only excessive use. He further requests that, given his inability to pay, the Court exercise its discretion and decline to impose fines, order payment of community restitution, award costs of prosecution, or declare him ineligible for any government benefits. And he asks the Court permit him to voluntarily report to the Federal Bureau of Prisons and that the Court recommend that he be assigned to a facility within reasonable driving distance of his family in Detroit, Michigan that offers programing pursuant to the First Step Act, as well as substance abuse treatment.

**Background**

For approximately three weeks spanning July and August of 2022, Fredrick Campbell, a 19-year-old from Detroit, Michigan, was in Vermont. He arrived driving a Ford F-150 pickup that had been leased from (and returned after 32 days to) a Budget Rent a Car office in Southfield, Michigan by an older Detroit resident, codefendant Terry Catchings.

Mr. Campbell associated for at least some of his time in Vermont with codefendant Jason Sicely, a resident of Barre City. Mr. Sicely suffers from a disabling medical condition affecting his legs, and he would sometimes stay at the Montpelier residence of codefendant Kimberly Kuncz, a former EMT who would provide care. In return, Mr. Sicely supplied her with drugs. He was at her residence again in early August, this time with Mr. Campbell, who spent two or three nights there as well.

On the morning of August 4, 2022, the Vermont Drug Task Force ("VDTF"), assisted by the Montpelier Police Department ("MPD"), executed a federal search warrant at the Kuncz residence. Drug paraphernalia and controlled substances were found, including a large quantity of cocaine base and a small quantity of methamphetamine in a portable safe belonging to Mr. Sicely.

Mr. Campbell and Mr. Sicely were not present during the search. They had departed the residence in the F-150 just prior to execution of the warrant. Members of the VDTF tailed them to the vicinity of the Hilltop Inn in Berlin, Vermont, a location commonly associated with drug dealing where Kuncz had only recently been surveilled making apparent drug sales.

During the tail, VDTF agents observed the F-150 exceed the posted speed limit on two occasions, and uniformed officers were tasked with pulling the vehicle over. Mr. Campbell, the operator, complied promptly, pulling into the Hilltop parking lot. Mr. Sicely was the front seat

passenger, and the rear seat was occupied by Kimberly Wescom and Nicholas Ward, a pedestrian picked up near the Inn.

The stop was prolonged, evolving from an investigatory stop to a full search of the occupants and the vehicle. Mr. Campell was arrested for possession of approximately 7 grams of cocaine base. Mr. Ward was found to be in possession of cocaine base as well and also taken into custody. Mr. Sicely was transported to the hospital for treatment of his legs, and Ms. Wescom was allowed to depart for her residence at the Hilltop.

At MPD, Mr. Campbell waived his Miranda rights and consented to be interviewed. He admitted to selling drugs (including a small quantity of cocaine base to Kuncz the evening prior to the search) and also to having gone target shooting with Sicely a few days earlier using a pistol that had been discovered loaded under the driver's seat of the F-150 during the vehicle search. He also acknowledged having visited Vermont one year earlier.

Both Mr. Campbell and Mr. Catchings entered into plea agreements that include stipulations of fact. Those stipulations establish that, during the July-August timeframe, Mr. Campbell had been knowingly and willfully assisting and aiding Mr. Sicely with the distribution of controlled substances; that Mr. Catchings facilitated and coordinated their drug trafficking activities; that the cocaine base seized from Mr. Sicely's safe weighed approximately 75 grams and the methamphetamine weighed approximately 2 grams; that the cocaine base seized from Mr. Campbell's person weighed approximately 7 grams; and that Mr. Campbell possessed the cocaine base seized from his person with the intent that he and Mr. Sicely would distribute it to others. Campbell Plea Agreement ¶ 4; Catchings Plea Agreement (**Doc. 142**) ¶ 4.

<u>**Supporting Arguments**</u>

<u>**Converted Drug Weight**</u>

Defense counsel objected to the estimated converted drug weight ("CDW") in the draft PSR. The component of that estimate concerning cocaine base believed to have been distributed prior to the searches is based on the largely uncorroborated grand jury testimony of a cooperating witness. The witness asserted that Mr. Campbell had been in Vermont participating in drug distribution activities for more than two years prior to the one-month timeframe alleged in the indictment. Defense counsel's objection focused on the witness's credibility and the reliability and relevance of the testimony relating to this expansive timeframe.

During the informal resolution conference, defense counsel was persuaded to withdraw his objection, principally for three reasons. First, the government has agreed to recommend that the Court apply the guidelines CDW conversion ratio applicable to powder cocaine. Plea Agreement ¶ 13(c). If accepted by the Court, this will reduce Mr. Campbell's base offense level 10 or more offense level points, substantially minimizing the estimate's impact on Mr. Campbell's guideline sentencing range. Second, the government has agreed to recommend a four-year term of probation as the appropriate sentence in this case. *Id.* ¶ 13(d). And third, it seemed unlikely that, if called to testify at a contested evidentiary hearing, the cooperating witness would retract grand jury testimony and risk federal prosecution on drug and/or perjury charges.

For all these reasons, defense counsel determined it would be in Mr. Campbell's best interests to withdraw the objection. With or without an objection, however, it remains the Court's first duty at sentencing to correctly determine the advisory guideline range. *Gall v. United States*, 552 U.S. 38, 49 (2007). That is why, in withdrawing the objection, defense counsel made clear to

Officer Brace and the attorney for the government that he would nevertheless detail his concerns with the estimate for the Court's consideration at sentencing.

<u>Post-Conference Resolution of Differences Regarding Weight of Seized Substances</u> – In preparing the draft PSR, Officer Brace determined the CDW for the two substances seized from Mr. Sicely's safe and the cocaine base seized from Mr. Campbell's person. She did this by applying to the field weights reported by law enforcement (78 grams of cocaine base and 2.5 grams of methamphetamine seized from the safe, and 7 grams of cocaine base seized from Mr. Campbell's person) the guideline CDW ratios for those substances (1 gram of cocaine base equals 3,571 grams of CDW, and 1 gram of methamphetamine equals 2 kilograms of CDW). These were then combined, generating a CDW of **308.54** kilograms.

After the informal resolution conference, defense counsel raised issue with the use of these field weights. It is undisputed that those weights include packaging. However, the guidelines direct that such materials are not to be included. USSG § 2D1.1, comment. (n. 1) ("Mixture or substance does not include materials that must be separated from the controlled substance before the controlled substance can be used."). Accordingly, to account at least to some extent for the weight of the packaging, defense counsel urged use of the stipulated weights set forth in paragraph 4(a) of the plea agreement – 75 grams of cocaine base and 2 grams of the methamphetamine for the substances seized from the safe, and 7 grams seized from Mr. Campbell's person. This suggestion was not adopted, although Office Brace did agree to note the discrepancies in the final PSR (*see* PSR ¶ 32, n.3).

The concern defense counsel sought to address with his suggestion has now been rendered moot. At the time of the informal resolution conference, no lab reports for any of the seized substances had been produced by the government. However, shortly after the conference, the

attorney for the government located and produced the lab report for the substance seized from Mr. Campbell's person. That report evidences that the substance contained a detectable amount of cocaine base and had a net weight of 6.95 grams. Officer Brace used this net weight in the final PSR.[1]

This week, after the final PSR had been submitted to the Court, the attorney for the government also located and produced the lab report for the substances seized from Mr. Sicely's safe. That report evidences that the substance containing a detectable amount of cocaine base had a net weight of 72.58 grams, and the substance containing a detectable amount of methamphetamine had a net weight of 1.87 grams. Responding to this latest lab report, Officer Brace suggested the parties bring the net weights to the Court's attention in their sentencing memoranda and indicated that she would prepare a supplement to the final PSR after sentencing should the Court request. Applying the guideline conversion ratios to the net weights generates CDW of **288** kilograms rather than the **308.36** kilograms set forth in the final PSR. While the difference may not appear substantial, application of the guideline multiplier ratios generates substantial additional CDW in the amount of **20.36** kilograms.

Concerns Regarding Cocaine Base Believed To Have Been Distributed Prior to Seizures – Defense counsel objected during the informal resolution conference both to the foundation for Officer Brace's estimate of cocaine base believed to have been jointly distributed by Mr. Sicely and Mr. Campbell prior to Mr. Campbell's arrest and to inclusion of that estimate as a component of CDW. To determine the CDW, Officer Brace first estimated the weight of a two-week supply based on distribution levels experienced between the summer of 2020 and March of 2022, as

---

[1]. The net weight indicates that the packaging for the substance seized from Mr. Campbell's person was minimal and therefore not material to determination of the offense level applicable to that substance. For this reason, and for the sake of simplicity, defense counsel's suggestion disregarded the differential and proposal use of the stipulated weight (7 grams) for this substance as well.

testified to by the cooperating witness. The witness told the grand jury that during this period $7,500 to $9,000 worth of cocaine base in prepackaged 50 pieces was being distributed each week. A 50 piece is $50 worth of the product weighing approximately 0.3 grams. Using the $7,500 figure, Officer Brace estimated that over two weeks approximately 90 grams of cocaine base would have been distributed (fifty 50-pieces x 6 days x 0.3 = 90 grams). She then applied the guideline ratio for cocaine base to that weight, generating additional CDW of **321.39** kilograms (90 grams x 3,571 grams ÷ 1000 grams = 321.39 kilograms).

Officer Brace then focused on the period after March 2022, when the cooperating witness testified that the locus of distribution shifted to Mr. Sicely's Barre City residence. The witness's participation apparently ended at this time, but she remained a customer of Mr. Sicely's. The grand jury was told that Mr. Sicely and Mr. Campbell were selling three times as much cocaine base after the shift as had been distributed when the witness was an active accomplice. Officer Brace did not attempt to calculate the weight of cocaine base distributed during this phase, however, because the witness did not provide specific quantities. Instead, Officer Brace stated her belief that, based on the above estimates, distribution over a two-week period following the shift conservatively placed the CDW for both seized and distributed substances at a level falling somewhere between **700 and 1,000** kilograms. This added four points to Mr. Campbell's base offense level, significantly increasing his sentencing exposure.

The foundation for this component of CDW is unchallenged grand jury testimony from a witness courting the favor of the government in the hope of avoiding prosecution. *See* Grand Jury Tr. at pp.8-9, lns. 24-3. That witness's testimony varied widely from other evidence developed during the investigation. To defense counsel's knowledge, the testimony of this witness is the only evidence suggesting Mr. Campbell's involvement was protracted. Information developed by law

enforcement, including documentation subpoenaed from the rental car company, suggests that Mr. Campbell was in Vermont during the timeframe alleged in the indictment for no more than a month, likely less. While he did acknowledge during his post-arrest interview visiting Vermont a year earlier, there seems to have been no other evidence suggesting he was involved in drug distribution at that time or that his stay on that occasion was prolonged. This casts serious doubt on the witness's testimony that Mr. Campbell was living in Vermont throughout the extended timeframe. In addition, the witness admitted to using the App "TextNow" to impersonate Mr. Catchings by purporting to send texts originating from his cell phone. In all these circumstances, the credibility of this grand jury witness's may fairly be questioned.

Moreover, much of the estimate at issue is extrapolated from activities said to have occurred many months, even years, before the timeframe alleged in the indictment. An expanded estimate, even when found to arise out of a "course of conduct" or a "common scheme," must be supported by specific evidence and may not rest on extrapolation. *United States v. Shonubi*, 998 F.2d 84, 89-90 (2d Cir. 1993).

As noted in the PSR, Application Note 5 to USSG § 2D1.1 states, "where there is no drug seizure or the amount seized does not reflect the scale of the offense, the Court shall approximate the quantity of the controlled substance." The offense of conviction here is Mr. Campbell's possession, on or about August 4, 2022 (the date of his arrest), of cocaine base and methamphetamine with the intent to distribute. Third Superseding Indictment (**Doc. 87**), Count Two. In defense counsel's view, the **288** kilograms of CDW attributable to the seized substances, resulting in a base offense level of 24, adequately reflects the scale of that offense. For these reasons, it is respectfully submitted that the Court should disregard this component of the CDW estimate. Otherwise, the tail will be wagging the dog (well over half, and perhaps more than 60

percent, of CDW as determined by Officer Brace is attributed to cocaine base believed to have been distributed prior to the timeframe alleged in the indictment).

### Government Recommendation to Apply the CDW Ratio for Powder Cocaine

Mr. Campbell asks the Court to accept and implement the government's recommendation to apply to the cocaine base in this case the CDW ratio for powder cocaine. The arguments and substantial support for the government's recommendation, including the racially deleterious consequences resulting from disparate ratios, are well known to the Court and need not be repeated.

Application of the powder cocaine and methamphetamine ratios to the net weights of the substances seized in this case produces a CDW of **19.91** kilograms (OL **14**), in sharp contrast to the **308.36** kilograms (OL **24**) set forth in the final PSR. The PSR then increases the base offense level by four additional points to account for the estimated quantity of cocaine base believed to have been distributed prior to the searches. The Court should disregard that four-level increase for the reasons stated above. With recommended adjustments for specific offense characteristics, and the three-level decrease for acceptance of responsibility, all as set forth in the PSR, the final offense level would be **15**, resulting in a guidelines sentencing range of **18** to **24** months, rather than the **87 to 108** months set forth in the final PSR.

### Government Recommended Sentence of Probation

Mr. Campbell asks the Court to accept the government's recommendation and sentence him to a four-year term of probation (*id.* ¶ 13 (d)), unless the Court determines that a lesser term is sufficient, but not greater than necessary, to achieve the statutory purposes of sentencing. This requires a variance to a non-guidelines sentence as a term of probation is not authorized under the guidelines, even at offense level 15 (Zone D).

Defense counsel submits the variance is warranted. The Court must of course consider the kinds of sentence and the sentencing ranges established by the guidelines for the applicable category of offender. "[I]n the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)). But the guidelines for drug offenses resulted from a flawed development process and result in unduly harsh sentences.

Unable to agree on priorities among statutory sentencing purposes and develop guidelines faithful to the parsimony principle of section 3553(a), the original Sentencing Commission achieved compromise by adopting an "empirical approach" that based punishment levels and adjustments to sentences largely on a statistical analysis of sentences served in the pre-guidelines era.[2] But the Commission did not apply this empirical approach to drug offenses. Defending a Federal Criminal Case, Vol. II at 17-815 (2010 Ed.). Instead, to minimize conflict between the guidelines and mandatory penalties, the Commission adopted a quantity-based approach. "It looked at those cases that triggered the severe five and ten-year statutory levels and established equal guideline ranges that applied to cases with the same facts; it then added additional quantity levels below, between, and above the two statutory levels. This had the effect of increasing the severity of sentences for all drug offenses, even those not directly affected by the mandatory-minimum statute." *Id.* at 17-780. Compounding the problem, the "real offense" system, implemented through the concepts of relevant conduct and especially expanded relevant conduct as applied in drug cases, further exacerbated the harshness of the resulting sentencing ranges.

---

2. One Commission member resigned rather than support the guidelines developed in this manner, arguing that it was not clear what purpose of punishment is advanced by averaging sentences imposed by judges applying diverse and inconsistent theories. Paul Robinson, *Dissent From the United States Sentencing Commission's Proposed Guidelines, reprinted in* 77 J. Crim. L. & Criminology 1112 (1986).

Thus, the Court made clear in *Kimbrough*, and even clearer in *Spears v. United States*, 555 U.S. 261 (2009), that because the empirical approach was not utilized, "even when a particular defendant in a crack cocaine case presents no special mitigating circumstances—no outstanding service to country or community, no unusually disadvantaged childhood, no overstated criminal history score, no post-offense rehabilitation – a sentencing court may nonetheless vary downward from the guideline range." 555 U.S. at 262.

That proposition commends itself in this case. This Court is in a "superior position" to find facts and assess their import under 3553(a) and may not presume that a correctly calculated guideline range is reasonable. Instead, the Court must consider that range together with the other factors specified in 3553(a). *Kimbrough*, 552 U.S. at 109; *Gall v. United States*, 552 U.S. 38, 49-51 (2007). "[E]ven in a mine-run case," a sentencing judge may conclude that the guidelines yield a sentence greater than necessary to achieve statutory sentencing purposes. *Kimbrough*, 552 U.S. at 109.

Here, a number of statutory sentencing factors support the government's probation recommendation. Mr. Campbell's history and characteristics, including his favorable upbringing, loving and supporting family, lack of any criminal history, and mostly positive behavior while on lengthy pretrial release in Detroit, Michigan, evidence that his risk of reoffending is low and that he is an excellent probation candidate. In addition, the government concluded that Mr. Campbell's role in the offense was essentially that of an order taker, not a manager or supervisor, and is not deserving of an upward adjustment, particularly in view of his young age, lack of any criminal history, and influence brought to bear on him by individuals with criminal histories. Thus, the nature and circumstances of Mr. Campbell's offense support the government's recommendation. Moreover, a four-year term of probation will provide adequate deterrence, both general and

specific, and will adequately protect the public. Probation will also provide Mr. Campbell in the most effective manner with opportunity for necessary educational and vocational training and other programming that may be recommended by his probation officer. Most important, a four-year term of probation will be sufficient to promote the purposes of sentencing. For these reasons, the Court is respectfully requested to accept the government's recommendation and impose a term of probation of four years, or less.

**<u>Alcohol Prohibition</u>**

In the event the Court decides to impose a term of imprisonment followed by a term of supervised release, defense counsel objects to the special supervised release condition proposed in the PSR prohibiting all use of alcohol and requests that the Court prohibit only excessive use.[3] In *United States v. Betts*, 886 F.3d 198 (2d Cir. 2018), the appeals court accepted the defendant's argument that a special supervised release condition prohibiting all alcohol use was not reasonably related to either his underlying crime or his admitted violation and that the ban involved a greater deprivation of liberty than reasonably necessary to achieve sentencing goals. The Second Circuit found that the sentencing court "was not presented with any evidence that defendant ever seriously abused alcohol." 886 F.3d at 202-03. The Court further stated, "It also provided no reason for imposing this special condition, beyond a clearly stated displeasure with defendant's performance while on supervised release." *Id.* at 203.

Defense counsel recognizes the Second Circuit noted that "[n]either defendant's underlying crime nor any of the conduct contributing to his violations of supervised release involved the use of alcohol" (*id.* at 202), whereas Mr. Campbell tested positive for alcohol more than once while on pretrial release. But there has been no indication his alcohol use was excessive

---

3. A ban on the excessive use of alcohol is an authorized discretionary condition of probation. 18 U.S.C. § 3563(b)(7).

or contributed in any way to violations of his supervised release conditions relating to employment, education, and compliance with all scheduled appointments. Indeed, of the two violation reports citing alcohol use, the first requested no action, and the second requested that the Court address the violation conduct at the change of plea hearing. The Court did so and did not take any action to modify or revoke conditional release following acceptance of Mr. Campbell's guilty plea. There have been no violations for alcohol use since.

Defense counsel is concerned that a complete prohibition of alcohol could too easily threaten Mr. Campbell's continued supervised release. That should not be permitted in the absence of evidence that he has a problem with alcohol abuse. It is respectfully submit that, as in *Betts*, "the special condition banning all alcohol use is not reasonably related to any of the factors outlined in Section 5D1.3(b)," and "the standard condition limiting 'excessive use' of alcohol . . . is sufficient to further the objectives of sentencing." *Id.* at 203.

## Conclusion

WHEREFORE, it is respectfully requested that the Court grant the relief requested and such other and further relief as to the Court seems just and proper.

Dated: December 1, 2023

/s/ *Gregory S. Mertz*
Gregory S. Mertz
Attorney at Law
5 Billings Court
Burlington, VT 05408
(802) 448-3674
gmertz@mertzlawfirm.com

*CJA Counsel for Fredrick Campbell II*